IN THE UNITEST STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **SALVATORE PALMA, JR.,** individually and as administrator of the Estate of **Vincent Dominic Palma**, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. 1:18-CV-294 |
| v. | ) ) ) | **JUDGE DAN A. POLSTER** |
| **DEPUTY MATTHEW JOHNS,** *et al.*, | ) ) ) | **OPINION AND ORDER** |
| Defendants. | ) | |

Plaintiffs, Salvatore Palma, Melissa Palma, and Alisha Palma, individually and as the administrator of the estate of decedent Vincent Dominic Palma (collectively, "Plaintiffs"), filed this action against Defendant Ashtabula County, Ohio, and Defendant Deputy Sheriff Matthew Johns (collectively, "Defendants"), alleging that Deputy Johns used excessive force in shooting Vincent Palma multiple times without provocation, causing his death.

Defendants filed a Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, which the Court now considers. For the following reasons, Defendants' Motion is **GRANTED**.

I. BACKGROUND

When establishing the record for a Motion for Summary Judgment, the Court considers the undisputed facts, viewed in the light most favorable to the non-moving party.

Plaintiffs' claims arise out of events that happened on February 8, 2017. On that date, Vincent Palma, who was living with his family at their home in Ashtabula County, got into an altercation with his sister over a television remote control. ECF Doc. 23 ¶ 13. Plaintiff Melissa

1

Palma, Vincent Palma's mother, called the police to have Vincent removed from their home. *Id*. Melissa testified that she wanted officers to see how Vincent was acting and to take him to a hospital. ECF Doc. 50 at 12. She also advised the dispatcher that Vincent suffered from mental illness, that Melissa believed Vincent is "bipolar, paranoid schizophrenic and maybe hallucinating," and that she did not believe Vincent was under the influence of anything. ECF Doc. 23 ¶ 13. Johns was contacted by the dispatcher, advised that Vincent was a "Code 76,"[1] and dispatched to the Palma home. *Id*. ¶ 15; ECF Doc. 50, Ex. 1 at 70:2-71:18.

When Johns arrived, he pulled his car into the driveway of the home and parked. *Id.* ¶ 19. The parked car was about forty (40) feet away from the front porch of the house. ECF Doc. 46 at 8. Vincent was standing on the porch with his parents[2], while Plaintiff Alisha Palma, his sister, was inside the house by a window. *Id.* at ¶ 18-19. Johns then exited his vehicle and began to approach the house. ECF Doc. 50 at 5. Johns alleged that when he exited the vehicle, he "gave a friendly wave," called out to Vincent "how are you, how's it going?," and made repeated calls to Vincent as he approached. ECF Doc. 46 at 4. When Johns was about twenty (20) to twenty-five (25) feet from the porch, Vincent began to descend from the stairs and walk towards Johns. ECF Doc. 50 at 5. Johns then began to back up, ultimately standing on the passenger side of his vehicle, across the car from where Vincent was walking towards him. ECF Doc. 46 at 5. All parties agree that, as he backed behind his car, Johns warned Vincent that he would fire his taser if Vincent didn't stop approaching and show his hands. ECF Doc. 46 at 5, 10, 12; ECF Doc. 50 at 3. Vincent's parents also told Vincent to stop advancing towards Johns. *Id*. Subsequent to the warning, Johns discharged his taser against Vincent. Vincent kept approaching, and Johns

---

[1] "Code 76" is the code used by the Ashtabula County Sheriff's Department to indicate that an individual has mental health issues. *See* ECF Doc. 50 at 5. The dispatcher did not advise Johns that Vincent was bipolar, schizophrenic and maybe hallucinating. *See* ECF Doc. 50, Ex. 1 at 73-74.
[2] Vincent was not armed but did not know this.

discharged the taser a second time, at which point Vincent fell into a puddle on the driver's side of the car. Vincent was now between six (6) and ten (10) feet from Johns. ECF Doc. 46 at 5. Vincent rose again, at which point Johns applied the taser a third and final time. ECF Doc. 50 at 5. This time, Vincent removed the needles and continued to advance. *Id*.

Johns continued to back away, moving from the vehicle and up a hill on the Palmas' property. At one point, he raised his baton above his head but did not strike Vincent. ECF Doc. 50 at 5. Instead, he lowered the baton and continued backing away from Vincent. Johns warned Vincent that he would shoot if Vincent did not stop, but Vincent kept advancing. ECF Doc. 46 at 9. After about ten (10) more steps backwards, Johns raised his gun, and Johns then fired downward towards Vincent's leg. When Vincent still did not stop advancing toward him, Johns fired no more than three shots aimed in the "center of mass" of Vincent's body. *Id*. at 6. At this point, Vincent leaned over and descended to the ground in a "bear crawl" stance with his hands on the dirt in front of him. ECF Doc. 50 at 6. However, instead of staying on the ground, Vincent tried to get back up, and Johns fired additional shots at Vincent's body. Overall, Johns shot Vincent nine (9) times in different parts of his body, including his head, shoulder, chest, stomach, and leg. ECF Doc. 23 ¶ 23. Vincent was transported by ambulance to Geneva Hospital, then to University Hospital in Cleveland, where he was pronounced dead. ECF Doc. 23 ¶ 24. In total, Johns had retreated backwards about 100 feet from the spot where he initially stood when Vincent began approaching. ECF Doc. 46 at 8.

## II. PROCEDURAL HISTORY

On February 8, 2018, Plaintiffs filed a nine-count complaint against Johns alleging a federal constitutional violation under 42 U.S.C. § 1983, state law claims of willful, wanton, and reckless conduct, assault and battery, wrongful death, survivorship, and infliction of emotional

distress on behalf of Salvatore Palma, Alisha Palma, and Melissa Palma, as well a *Monell* claim against Ashtabula County under 42 U.S.C. § 1983 for inadequate supervision, investigation, and training. ECF Doc. 1.

On January 25, 2019, Plaintiffs filed an amended complaint adding as defendants Jay Thomas, and dispatchers Brian Thomas and Amanda Foit, who were all employees of the Ashtabula County Sheriff's office during the events alleged. ECF Doc. 23. On March 20, 2020, the parties stipulated to dismiss the claims without prejudice against the above-mentioned three additional defendants, returning the case to the original parties. ECF Doc. 42. On October 2, 2020, Defendants filed their motion for summary judgment pursuant to Fed. R. Civ. P. 56. ECF Doc. 46. On January 4, 2021, Plaintiffs filed their opposition brief. ECF Doc. 50. Defendants filed their reply brief on February 1, 2021. ECF Doc. 52.

### III. DISCUSSION

#### A. Standard of Review

Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, if a reasonable jury could return a verdict for the nonmoving party, summary judgment for the moving party is inappropriate. *Baynes v. Cleland*, 799 F.3d 600, 606 (6th Cir. 2015). The movant bears the initial burden of showing that there is no material issue in dispute. *Id*. at 607 (other citations omitted). A fact is deemed material only if it might affect the outcome of the case under the governing substantive law. *Id*. (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994), in turn citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986)). The moving party may discharge its burden by "pointing out . . . an absence

4

of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In reviewing a motion for summary judgment, the court must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party. *Id*. (citing *Kalamazoo Acquisitions, LLC v. Westfield Ins. Co*., 395 F.3d 338, 342 (6th Cir. 2005)). Although all inferences are drawn in favor of the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the nonmoving party must present significant and probative evidence in support of its complaint. *See Anderson*, 477 U.S. at 249-50.

### B. Qualified Immunity on Plaintiffs' Fourth Amendment Claim

Plaintiffs allege that Johns used excessive force in killing Vincent Palma because Vincent posed no objective imminent threat of great bodily injury or death to Johns on February 8, 2017. As such, Plaintiffs brings a claim under 42 U.S.C. § 1983, which creates a civil cause of action against individuals who, while acting under color of state law, deprive a person of the "rights, privileges or immunities secured by the Constitution or laws of the United States." See 42 U.S.C. § 1983. In bringing their § 1983 claim, Plaintiffs allege that Johns violated Vincent's Fourth Amendment right to be free from excessive force by a law enforcement officer. As Plaintiffs correctly point out, "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen must be analyzed under the Fourth Amendment and its reasonableness standard[.]" *Jones v. Sandusky Cnty., OH*, 541 F. App'x 653, 660 (6th Cir. 2013) (other citations omitted).

It is undisputed that Johns is a law enforcement officer. As such, Defendants claim that he should be entitled to qualified immunity because he acted reasonably under the circumstances. Qualified immunity will shield Defendants from civil liability under § 1983 for performing

5

discretionary duties related to this action unless: (1) they violated one of Vincent Palma's constitutional rights; and (2) that right was clearly established at the time it was violated. Courts may consider these two inquiries in either order. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

1. Whether Vincent's Constitutional Right was Violated

The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive force by law enforcement officers. *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015). While officers may use some degree of physical coercion to make an arrest, the Fourth Amendment requires the amount of force to be objectively reasonable under the totality of the particular circumstances. *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[W]hether the force used to effect a particular seizure is reasonable . . . requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (other citation and quotes omitted). While reasonableness is ultimately based on the totality of the circumstances, three factors guide the analysis: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id*. When an officer uses force multiple times, the Sixth Circuit has found it necessary to divide the incident into segments and judge each use of force on its own terms to see if the officer acted reasonably at each stage. *See Jones*, 541 F. App'x at 660.

It goes without saying that what happened on February 8, 2017 was a tragedy. An unarmed mentally challenged young man was fatally shot. Johns responded alone to a call stemming from a domestic dispute over a television remote control device. This was not a crime. Furthermore, the

6

dispatcher did not advise Johns of Vincent's serious mental condition. Within a few minutes, Johns had fatally shot the suspect, Vincent Palma. Vincent proved to be unarmed, and in retrospect, it is highly unlikely that he would have harmed Johns. But that is not the situation that Johns reasonably perceived at the time. *See Graham*, 490 U.S. at 396 (finding that the reasonableness of the force must be judged from the perspective of a reasonable officer on the scene, not "with the 20/20 vision of hindsight").

When Johns arrived at Vincent's home, he pulled his patrol car into the driveway and parked. He then exited his vehicle and began to approach the house. Shortly thereafter, Vincent began to approach Johns. The undisputed facts are Johns ordered Vincent to stop and show his hands, but Vincent failed to comply. Although Johns admits that he never saw a weapon, he was concerned for his safety. ECF Doc. 50, Ex. 1 at 101; ECF Doc. 46 at 6. Vincent was a short distance away and was moving forward towards him. Johns' fear was reasonable.

As Vincent continued to walk towards Johns as he was stepping backwards, Johns warned Vincent that if he did not stop and show his hands, he would be tased. ECF Doc. 46 at 5, 10, 12. Vincent ignored Johns' commands. Vincent also ignored the pleas of his parents to comply with Johns' directives. *Id*. Subsequent to the warning, Johns discharged his taser against Vincent. Vincent kept approaching, and Johns discharged the taser a second time, at which point Vincent fell to the ground. Vincent rose again, at which point Johns applied the taser a third and final time. This time, Vincent pulled out the prongs and continued to advance towards Johns. Plaintiffs do not contend that multiple taser applications after a suspect fails to comply with an officer's orders are not objectively reasonable, especially given the circumstances confronting Johns. *See, e.g., Sheffey v. City of Covington,* 564 F. App'x 783, 796 (6th Cir. 2014) (affirming lower court's finding that multiple taser applications while attempting to subdue a resisting subject are objectively

7

reasonable). There is no evidence refuting Johns' testimony that Vincent failed to comply with every order given by him prior to tasing Vincent. And since neither the first nor the second tase stopped Vincent, it was very reasonable for Johns to tase him a third time.

After being tased three times, no reasonable person would have continued to advance towards an officer, but Vincent did. Put another way, at that point it was reasonable for Johns to consider Vincent a serious threat, particularly since Vincent refused to show his hands.[3] After the taser applications, Johns continued to back away, moving from his vehicle and up a hill on the Palmas' property. At one point, Johns grabbed his baton to use it but, due to Vincent briefly stopping, he decided that striking Vincent was not necessary. ECF Doc. at 50, Ex. 1 at 163. Seconds later, Vincent resumed his advance towards Johns. As Johns continued to retreat, he pulled out his service weapon and warned Vincent that he would shoot if Vincent did not comply. ECF Doc. 46 at 9. Vincent continued to ignore these directives. Johns deliberately aimed his first shot low and towards Vincent's leg, with the objective of stopping Vincent, but not seriously injuring him. ECF Doc. 46 at 6; ECF Doc. 50, Ex. 1 at 193.[4] Vincent did not stop advancing. At this point, Johns aimed center mass and shot Vincent. While the shots knocked Vincent down, they did not stop him; Vincent attempted to get off the ground. ECF Doc. 50, Ex. 1 at 196-99. In a few more seconds, Johns shot Vincent several additional times. *See Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) ("[A]n officer may use deadly force whenever he or she, in the face of a rapidly evolving situation, has probable cause to believe that a suspect poses a serious physical threat either to the police or members of the public."). It was only after Johns fired

---

[3] Johns briefly saw one of Vincent's hands when Vincent pulled the taser prongs out of his body. ECF Doc. 50, Ex. 1 at 139.
[4] This is corroborated by the testimony of Vincent's father. ECF Doc. 46 at 9.

8

the additional shots that Vincent finally stopped advancing. While Johns reloaded his weapon, he did not fire any more shots. ECF Doc. 50, Ex. 1 at 203-05.

Although Plaintiffs allege in a conclusory fashion that there is a dispute as to material facts surrounding the reasonableness of Johns' actions, the Court finds none. Notably, Plaintiffs do not identify any specific material facts that are in dispute. Given the circumstances, the Court finds that a reasonable officer in Johns' position would have perceived Vincent as a threat. *See Simmonds v. Genesee Cnty.*, 682 F.3d 438, 445 (6th Cir. 2012) (finding that the use of deadly force is assessed under the objective reasonableness standard, that "contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances . . ."). Vincent never spoke a word, he never responded to Johns' commands, and he repeatedly refused to comply with two reasonable orders: stop and show your hands. Vincent also ignored the calls of his parents to stop and to do what the officer was telling him to do. Three uses of non-deadly force– taser applications –had no visible effect on Vincent.

In hindsight, as Vincent proved to be unarmed, it is probable that his actions were caused by his mental illness, and that he would not have injured Johns. However, the Court must judge Johns' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and thus cannot charge Johns with knowledge that he did not possess. *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 637-38 (6th Cir. 2013). Likewise, Vincent's mental status is not the only factor that the Court is required to consider. *See Gaddis v. Redford Township*, 364 F.3d 763, 775 (6th Cir. 2004) ("[A] suspect's apparent mental state is one of the facts and circumstances of the particular case . . . that should be considered in weighing an excessive force claim."). A law enforcement officer is allowed to use force against a mentally challenged suspect as long as the *Graham* factors otherwise indicate that the use of force is objectively reasonable.

9

*See Johnson v. Combs*, No. 4:04-CV-019, 2005 U.S. Dist. LEXIS 21634, 2005 WL 2388274, at *5 (W.D. Ky. Sept. 27, 2005) ("Whether or not [plaintiff] was mentally ill, he posed an immediate threat to the Troopers when he charged at them with a deadly weapon."). Consequently, Plaintiffs have failed to demonstrate that Johns violated Vincent's constitutional right to be free from excessive force. Accordingly, because Johns' escalating use of force, up to and including deadly force, was objectively reasonable under the circumstances as he perceived them, he is entitled to qualified immunity.

### C. Qualified Immunity: State Law Claims

Ohio R.C. 2744.03 provides immunity from liability to an employee unless: (1) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (2) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Under Ohio law, "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Jones*, 541 F. App'x at 667.

Plaintiffs argue that Johns is not entitled to political subdivision immunity pursuant to Ohio R.C. 2744.03 regarding Plaintiffs' state law claims. To support this position, Plaintiffs did not identify what specific actions made Johns' actions malicious, wanton, or reckless. As Defendants noted, the Sixth Circuit has held that, "[w]hen federal qualified immunity and Ohio state law immunity under Ohio Rev. Code § 2744.03(A)(6) rest on the same questions of material fact, [courts] may review the state law immunity defense 'through the lens of [a] federal qualified

10

immunity analysis.'" *Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)). On the record before the Court, considering the totality of the circumstances, for the reasons explained above, the Court concludes there is no basis for finding that Johns acted wantonly, i.e., that he failed to exercise any care toward those to whom a duty of care is owed under circumstances in which there is great probability that harm will result, or recklessly, i.e., that he acted with conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances he faced. Johns is therefore entitled to immunity from Plaintiffs' state law claims.

### D. Municipal Liability

Plaintiffs assert that the Ashtabula County Sheriff's Department's failure to adequately train Johns in the proper exercise of force constitutes deliberate indifference to Vincent's rights. A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Thus, a governmental entity can only be held liable on the basis of its own conduct. *See Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996). To prevail on a § 1983 claim against a municipality, a plaintiff must establish: (1) that he suffered a deprivation of a constitutionally protected interest; and (2) the alleged deprivation was caused by an official policy, custom, or usage of the municipality. *Monell*, 436 U.S. at 694. Because the Court finds that Johns did not violate Vincent's Fourth Amendment rights, Plaintiffs cannot rely on Johns' conduct to establish a claim of municipal liability against Ashtabula County. *See Vereecke v. Huron Valley School Dist.*, 609 F.3d 392, 404 (6th Cir. 2010) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have

11

authorized the use of constitutionally excessive force is quite beside the point."). Accordingly, Defendants is entitled to summary judgment on Plaintiffs' *Monell* claim.

## IV. CONCLUSION

The judicially-created doctrine of qualified immunity has come under increased scrutiny in recent months, and there are those who argue that it creates an unjustified impediment against holding law enforcement officers accountable for the wrongful use of deadly force. When applied properly, however, qualified immunity insulates law enforcement officers from having to stand trial and potentially suffer crushing personal financial liability for split-second judgment calls and even for negligence. Federal civil rights lawsuits are filed against officers in their individual capacity. On their modest salaries, it would be difficult for any officer to accumulate substantial wealth, and insurance companies don't write policies to cover police officers on the job. A judgment of $100,000 would likely force most officers into bankruptcy. Without the doctrine of qualified immunity or something similar, it would be almost impossible to attract people into a career in law enforcement.

A law enforcement officer may only use force if a suspect poses a danger to the officer or others, and he/she may only use force sufficient to neutralize that threat. The use of force must be objectively reasonable, based upon the circumstances and conditions known to the officer at the time, as opposed to via hindsight. As detailed above, Johns' first use of force was the taser, designed to stop a suspect without hurting him. Three taser applications failed to stop Vincent from advancing. Next was the display of the gun and the warning that Vincent would be shot; that also failed to stop Vincent's advance. Shots at Vincent's leg didn't stop him. Finally, shots to Vincent's center mass knocked him down, but Vincent rose in a bear crawl position and continued to advance towards, Johns. Johns continued to shoot until Vincent stopped, and then he shot no

more. These actions were reasonable in light of the threat Johns perceived from Vincent's actions. Accordingly, because there are no genuine disputes of material fact on any of Plaintiffs' claims, the Court **GRANTS** summary judgment, ECF Doc. 46, in favor of Defendants.

**IT IS SO ORDERED.**

*/s/ Dan Aaron Polster March 2, 2021*
**Dan Aaron Polster**
**United States District Judge**

**IN THE UNITEST STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**