IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| SALVATORE PALMA JR., individually and as administrator of the Estate of Vincent Dominic Palma, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>DEPUTY MATTHEW JOHNS, et al.,<br><br>  Defendants. | Case No. 18-cv-294<br><br>Judge Dan Aaron Polster<br><br>**OPINION & ORDER** |

Before the Court is the joint Motion for Summary Judgment on Count IX of the First Amended Complaint (the "Motion") by Defendant Ashtabula County, Ohio (the "County") and Defendant Deputy Matthew Johns (collectively, "Defendants"). ECF Doc. 60. For the following reasons, the Motion is GRANTED in part and DENIED in part.

## BACKGROUND

### A.  The Underlying Deputy-Involved Shooting

This case arises out of the shooting death of Vincent Palma by Defendant Matthew Johns in February 2017. *See* ECF Doc. 23. At the time of the shooting, Johns was on duty as a deputy with the Ashtabula County Sheriff's Office ("ACSO" or the "Office"). ECF Doc. 61-1 at 63.

The shooting occurred after Vincent's stepmother, Plaintiff Melissa Palma, called 9-1-1 to report a domestic disturbance between Vincent and his stepsister, Plaintiff Alisha Palma, over a broken television remote at the family's shared home. ECF Doc. 50-6 at 86-87. When placing the emergency call, Ms. Palma informed the 9-1-1 operator that Vincent had "mental issues" and that she wanted him removed from the house. *Id.* at 97-98.

Johns was then dispatched to the Palmas' house. ECF Doc. 60-1 at 69-71. When en route, Johns learned that he was responding to an incident involving an individual with mental health issues who had broken a television remote. *Id.* at 69-71.

Upon arriving at the Palmas' house, Johns encountered Vincent sitting on the front porch, and Vincent almost immediately walked through the front yard and towards Johns. *Id.* at 80. Vincent said nothing and made no threatening gestures, but Johns retreated and directed Vincent to stop walking towards him. *Id.* at 80-102. Vincent did not comply and continued walking wordlessly towards Johns, at which point Johns used his taser on Vincent three times. *Id.* at 119-40. Vincent temporarily collapsed to the ground after being tased, but he recovered from the shock and resumed his silent walk towards Johns. *Id.* By this time, Ms. Palma, Alisha, and Vincent's father, Plaintiff Salvatore Palma Jr., were all outside of their home and watching the encounter unfold. ECF Doc. 50-5 at 65; ECF Doc. 50-6 at 87-88. When Vincent continued walking towards Johns, Johns drew his firearm and shot Vincent multiple times in the leg, abdomen, and head. *Id.* at 191-202; ECF Doc. 50-3 at 4.

**B.**     **Procedural History**

In February 2018, Plaintiffs brought the instant action against Defendants. *See generally* ECF Doc. 1. As relevant here, the amended complaint asserted a *Monell* claim against the County in Count IX, which is premised upon the County's failure to either: (1) properly investigate the shooting incident; or (2) train Johns on the appropriate use of force, the use of his baton, the manner in which to de-escalate a situation, or encounters with mentally ill individuals. ECF Doc. 23 at ¶¶ 55-61.

On March 2, 2021, the Court granted summary judgment in favor of Defendants on every count, including Plaintiffs' *Monell* claim. *See generally* ECF Doc. 53. The Court concluded that

Johns did not violate Vincent's constitutional rights and was therefore entitled to qualified immunity. *Id.* at 10-11. And, without an underlying constitutional violation, the County could not be liable on Count IX. *Id.* at 11-12. In so ruling, the Court did not address the second prong of Plaintiffs' *Monell* claim—*i.e.*, whether the plaintiff's constitutional deprivation resulted from the County's official policy, custom, or usage. *Id.*

However, the Sixth Circuit recently reversed the Court's summary judgment ruling and revived all of Plaintiffs' claims. *See generally* ECF Doc. 57; *see also Palma v Johns*, 27 F.4th 419 (6th Cir. 2022). That court concluded there were genuine disputes of material fact concerning whether Johns violated Vincent's clearly established constitutional rights, and, thus, Defendants were not entitled to summary judgment on qualified immunity grounds. *Id.*

Following remand, the Court directed the parties to submit further briefing to address whether the second prong *Monell* can be satisfied. ECF Minutes of Proceedings, Apr. 13, 2022.[1] In accordance with that order, Defendants filed the Motion and again seek summary judgment on Count IX. ECF Doc. 60. Plaintiffs then submitted an opposition brief, and Defendants filed a reply in support of the Motion. ECF Docs. 61, 62.

**C.**     **Facts Relevant to the *Monell* Claim**

In addressing the second *Monell* prong, the parties have relied on different parts of the record evidence. The Court now outlines the parties' cited facts.

**1.** *Defendants' Cited Facts*

In support of the Motion, Defendants primarily rely on a second affidavit from ACSO Chief Deputy Terry Moisio, who was familiar with: (1) the investigation into Vincent's death, (2) ACSO's training requirements for deputies, and (3) ACSO's written policies. *See* ECF Doc. 60 at

---

[1] To give effect to the Sixth Circuit's remand order, the Court further instructed the parties to assume that the first prong of the *Monell* claim was satisfied.

2-5. Several of ACSO's written policies were attached to the affidavit, including the Office's use-of-force policy and conductive electrical weapon policy. *Id.* at Exs. A-1, A-2.

With respect to the investigation into Vincent's death, Chief Deputy Moisio affirmed that ACSO deputies responded to the scene of the shooting and took statements from witnesses. *Id.* ¶ 19. Thereafter, the Bureau of Criminal Investigation ("BCI") conducted an independent investigation and presented the case to an Ashtabula County grand jury, but the grand jury did not indict Johns. *Id.* ¶ 20.

With respect to deputy training, Chief Deputy Moisio affirmed that ACSO's deputies received training on the appropriate use of force and on de-escalation techniques. For instance, ACSO trained its deputies whenever the office's written use-of-force policy changed. *Id.* ¶ 6. He further stated ACSO deputies receive use-of-force training during ACSO's annual weapons training, during classes with the Ohio Peace Officer Training Academy ("OPOTA"), and during periodic field training. Chief Deputy Moisio also affirmed that Johns completed a course on de-escalation techniques, and a copy of Johns' completion certificate was appended to the affidavit as Exhibit A-3. *Id.* ¶ 18.

Chief Deputy Moisio's affidavit also states that "how to deal with an encounter with suspect mentally ill persons" was "discussed" during the various use-of-force trainings he described. *Id.* ¶ 6. However, the affidavit provides no further detail about these discussions—it does not specify which of the use-of-force trainings discussed this topic, the content of the discussions, the frequency with which the discussions occurred, the length of the discussion, or who attended the discussions. *See generally id.*

In addition to Chief Deputy Moisio's affidavit, Defendants have also relied on Johns' second affidavit. *See generally* ECF Doc. 60. In this affidavit, Johns affirmed that he received

training on the appropriate use of force during ACSO's annual weapons training and during OPOTA's Continuing Professional Training ("CPT") classes. *Id.* ¶¶ 5-6. He further affirmed that he received training on how to handle encounters with mentally ill individuals, but, like Chief Deputy Moisio's affidavit, Johns' affidavit provides no details about these trainings.

2. *Plaintiffs' Cited Facts*

Plaintiffs' statement of facts comes largely from Johns' deposition testimony, during which he described the training programs he completed as an ACSO deputy. ECF Doc. 60-1 at 24-31. He received field training when he was first hired as an ACSO deputy, and he attended the OPOTA-required CPT classes, which "touched on" the appropriate use of force. *Id.* 24-29.

Yet, Johns further testified that "there have been years" when he received no training whatsoever, and he indicated that he received no training on how to handle encounters involving domestic violence, individuals with mental illness, or individuals under the influence of drugs or alcohol. *Id.* at 29, 49. ACSO did not require deputies to be trained on these issues, and it did not have any written protocol on how such situations should be handled. *Id.* at 29, 49-51. Despite this lack of guidance, Johns acknowledged that he regularly encountered domestic violence situations and individuals with mental illnesses. *Id.* at 49-51. ACSO also did not mandate that its deputies be trained on how and when to use their batons, and Johns' only training on this topic occurred during the OPOTA basic training program. *Id.* at 30-31.

Plaintiffs also cite to ACSO Sheriff William Johnson's deposition, which corroborated much of Johns' testimony about the lack of training programs. *See generally* ECF Doc. 61-2. Sheriff Johnson testified that ACSO did not offer any training programs to its deputies and, once basic training and field training were complete, ACSO did not require its deputies to receive any particular training. *Id.* at 14-15, 30-31. Instead, the deputies' training requirements were set by

OPOTA. *Id.* at 30-31. Sheriff Johnson further testified that ACSO neither offered any training on the use of force nor required its deputies to receive any additional training on this subject after completing OPOTA's basic training program. *Id.* at 38. Sheriff Johnson noted that ACSO maintained a written manual, which included the office's use-of-force policy, but the deputies were never tested on any of the manual's policies. *Id.* at 37.

With respect to encounters with mentally ill individuals, Sheriff Johnson testified that ACSO did not offer or require any training on this subject, and he did not believe that OPOTA required any training on how to handle such encounters. *Id.* at 32-34. Sheriff Johnson acknowledged that the deputies encountered individuals with mental illnesses on a daily basis, and he testified that ACSO did not require any training *because* the deputies were encountering mentally ill individuals on a regular basis. *Id.* According to Sherriff Johnson, the deputies were "training every day" on how to handle these encounters. *Id.* at 32-33.

## LEGAL STANDARD

A district court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). To obtain summary judgment, the moving party bears the burden to meet this standard. *Rafferty v. Trumbull Cnty.*, 915 F.3d 1087, 1093 (6th Cir. 2019).

Comparatively, summary judgment is inappropriate if there are genuine disputes of material fact—*i.e.*, the parties dispute any fact that has the potential to affect the outcome of the case under the governing substantive law. *Baynes v. Cleland*, 799 F.3d 600, 606-07 (6th Cir. 2015). When determining whether a genuine dispute of material fact exists, a district court must construe the evidence and draw all reasonable inferences in favor of the non-moving party. *Wright v. City*

*of Euclid, Ohio*, 962 F.3d 852, 864 (6th Cir. 2020). Yet, the reviewing court may neither weigh the parties' evidence nor resolve any factual disputes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the court's review is limited to determining whether there is evidence that could lead a reasonable jury to return a verdict in favor of the non-moving party. *Doe v. Metropolitan Gov't of Nashville & Davidson Cnty. Tenn.*, 35 F.4th 459, 463 (6th Cir. 2022) (citing *Anderson*, 477 U.S. at 248).

## ANALYSIS

To obtain summary judgment on Count IX, Defendants bear the burden of proving that Plaintiffs' *Monell* claim against the County fails as a matter of law on the undisputed facts of the case. Yet, as detailed above, the parties dispute nearly every fact that relates to the *Monell* claim, and the Motion must be denied if any of these disputed facts are material to the outcome of the case. Thus, to resolve the Motion, the Court must first evaluate the substantive law governing Count IX and then must determine whether there are any facts which would permit a reasonable jury to find in favor of Plaintiffs under that law.

Accordingly, the starting point for the Court's analysis is the legal standard for the second element of a *Monell* claim, which requires a plaintiff to show that a local government's official policy or custom caused the plaintiff to suffer a constitutional deprivation. *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Because a local government cannot be held vicariously liable for its employees' actions under 42 U.S.C. § 1983, a plaintiff can succeed on a *Monell* claim only when the local government's deliberate conduct was the "'moving force' behind the injury alleged." *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (quoting *Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)).

To meet the second *Monell* element, a plaintiff may invoke any of four methods to prove a local government's illegal policy or custom: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *Wright*, 962 F.3d at 880.

Here, Plaintiffs have relied on methods two and three in bringing Count IX's *Monell* claim, namely that the County: (1) failed to investigate Vincent's death or Johns' actions, which amounts to ratification of an illegal act under method two; and (2) failed to train its deputies on the appropriate use of force, encounters with mentally ill individuals, de-escalation techniques, or baton use. Yet, in seeking summary judgment, Defendants maintain that Plaintiffs cannot satisfy the legal standard for the second *Monell* prong, regardless of whether the claim is based on a failure to investigate or a failure to train. Accordingly, the Court assesses Plaintiffs' reliance on both methods in turn.

**A.      Ratification by Failure to Investigate**

Turning first to method two, a plaintiff can establish the second *Monell* prong by showing that a local government exhibited a pattern of ratifying employees' unconstitutional acts by failing to meaningfully investigate and punish allegations of unconstitutional conduct. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Stated differently, the local government can be liable for the constitutional violation only if its custom of tolerance for such violations caused the plaintiff's claimed injury. *David v. City of Bellvue, Ohio*, 706 F. App'x 847, 852 (6th Cir. 2017). Thus, a local government's failure to investigate the plaintiff's claim cannot alone be the basis of *Monell* liability—a faulty *post hoc* investigation can never be the cause of an injury that already occurred. *Smith v. City of Troy, Ohio*, 874 F.3d 938, 947 (6th Cir. 2017).

Accordingly, here, Count IX fails to the extent that it is premised upon a failure to investigate because Plaintiffs have not identified any evidence to suggest that the County previously ratified any ACSO deputy's unconstitutional acts. Rather, Plaintiffs maintain only that the County's investigation into Vincent's death was inadequate, *see* ECF Doc. 61 at 14, but the Sixth Circuit has repeatedly made clear that this type of *post hoc* ratification is insufficient to impose liability under *Monell*. Thus, even assuming *arguendo* that the County failed to conduct a proper investigation into Vincent's death, there are no facts on which a reasonable jury could conclude that the faulty investigation caused Vincent's constitutional deprivation. Therefore, the Court agrees with Defendants that the *Monell* claim cannot succeed on a ratification-by-failure-to-investigate theory of liability.

**B.**    **Policy of Inadequate Training**

Turning next to method three, a plaintiff may hold a local government liable on a failure-to-train theory by showing: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). When determining whether a municipality adequately trained its employees, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Wright*, 962 F.3d at 881.

In a narrow set of circumstances, a plaintiff can establish an inadequate training program was the result of deliberate indifference by demonstrating that the local government failed to equip employees with specific tools necessary to handle recurring situations. *Ouza v. City of Dearborn Hts., Mich.*, 969 F.3d 265, 287 (6th Cir. 2020) (citing *Board of Cnty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 409 (1997)). While an inadequate training program is more commonly

established with evidence that a local government did not respond to repeated complaints of constitutional violations, the local government can also be liable when it ignored an obvious need for a particular training. *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

For instance, in *Russo v. City of Cincinnati*, the Sixth Circuit reversed a summary judgment award in favor of a defendant-city where the plaintiff presented evidence that the defendant-city failed to train police officers on how to use force when dealing with a mentally ill individual, even after the defendant-city learned that such encounters were a regular occurrence. 953 F.2d 1036, 1047 (6th Cir. 1992). In so holding, the court observed that the defendant-city claimed that its officers were trained on how to handle encounters with mentally ill individuals, but none of the officers could provide specific information about the content of that training. *Id.* at 1046.

Here, as in *Russo*, the Court concludes that there is a genuine factual dispute about whether the ACSO deputies received any training on encounters with mentally ill individuals, and this precludes summary judgment on Plaintiffs' failure-to-train theory of *Monell* liability. As an initial matter, Sheriff Johnson and Johns both acknowledged that the ACSO deputies encounter individuals with mental illness on a daily basis. ECF Doc. 61-2 at 32-33. Thus, the County should have been aware that the ACSO deputies required training to handle this recurring situation. Yet, there is a clear factual dispute as to whether the ACSO deputies ever received this necessary training. On the one hand, Johns and Sheriff Johnson testified at their depositions that no such training was provided or required. ECF Doc. 61-1 at 29, 49; ECF Doc. 61-2 at 32-34. Yet, on the other hand, Chief Deputy Moisio's and Johns' affidavits state that encounters with mentally ill individuals were "discussed" during use-of-force trainings, although the affidavits provide no specifics about the nature or content of the discussion. ECF Doc. 60-1 at ¶ 6; ECF Doc. 60-2 at ¶ 7. Moreover, this dispute is material to the outcome of the case because, as even Defendants

recognized, a complete failure to train the ACSO deputies on a recurring issue can result in *Monell* liability. *See* ECF Doc. 62 at 2-5 (citing *Ouza*, 969 F.3d at 289). As such, this issue can be resolved only by determining which evidence is more credible—the deposition testimony or the affidavits—but the Court cannot make such a determination at the summary judgment stage. Instead, the parties' factual dispute must be put to a jury, making summary judgment inappropriate.

Furthermore, the Court concludes that there is evidence to suggest that, if the County did fail to train the ACSO deputies on encounters with mentally ill individuals, then that failure amounts to deliberate indifference that caused Vincent's death. Namely, Sherriff Johnson testified that he did not require the ACSO deputies to be trained on encounters with mentally ill individuals specifically *because* the deputies were encountering such individuals on a daily basis. ECF Doc. 61-2 at 32-33. Thus, there is record evidence to suggest that Sherriff Johnson, as the Office's leader, knew that the deputies were untrained in this area of their jobs, but he still allowed the deputies to encounter mentally ill individuals on a daily basis. *See Ouza*, 969 F.3d at 289 ("[A] complete failure to provide any type of training as to [] recurring situations may amount to deliberate indifference[.]"). A reasonable jury could conclude that Sherriff Johnson was deliberately indifferent to the rights of the mentally ill individuals in his county, and this ultimately led to Vincent's death.

That said, the Court does agree with Defendants that Plaintiffs cannot succeed on their *Monell* claim by citing a lack of training on the appropriate use of force, de-escalation techniques, or baton use. First, while there is record evidence to suggest that the deputies' training on the appropriate use of force and baton use may have been lacking, Johns did acknowledge during his deposition that the appropriate use of force was at least discussed at some of his trainings. ECF Doc. 61-1 at 28-29. Thus, there is evidence that at least some training was provided, and a failure-

to-train theory of liability cannot stand under such facts. *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982). Moreover, Plaintiffs have not identified any evidence to suggest the County was deliberately indifferent to the need for the trainings on use of force or on baton use, which further precludes *Monell* liability. Second, the undisputed evidence establishes that Johns did receive training on de-escalation techniques, which is fatal to Plaintiffs' theory on that portion of the claim.

Therefore, in sum, Defendants have failed to carry their burden on Plaintiffs' failure-to-train theory of *Monell* liability with respect to the ACSO deputies' training on encounters with mentally ill individuals. There are genuine disputes of material fact regarding the deputies' training on this subject, and, in turn, summary judgment must be denied. However, no such dispute exists with respect to the deputies' training on the appropriate use of force, baton use, or de-escalation techniques. Accordingly, summary judgment is appropriate on those theories of liability.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment on Count IX of the Amended Complaint (ECF Doc. 60) is **DENIED** in part and **GRANTED** in part. Plaintiffs may proceed on their theory of *Monell* liability that the County failed to adequately train the deputies on encounters with mentally ill individuals. However, Defendants have demonstrated that no genuine dispute of material facts exists with respect to the Plaintiffs' failure-to-investigate theory or their failure-to-train theory with respect to the use of force, baton use, and de-escalation techniques, and summary judgment is, therefore, appropriate on those aspects of Count IX.

**IT IS SO ORDERED.**

**Date:** September 6, 2022

*/s/ Dan Aaron Polster*
**Dan Aaron Polster**
**United States District Judge**